## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| TAMMY M., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:18-CV-1659-K (BH) |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Tammy M. (Plaintiff) seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act.  (doc. 20 at 3.) Based on the relevant findings, evidence, and applicable law, the decision should be **REVERSED**, and the case **REMANDED** for reconsideration.

### I.  BACKGROUND

On October 17, 2014, Plaintiff filed her application for SSI, alleging disability beginning on October 17, 2014.  (doc. 15-1 at 422, 611-18.)[2]  Her claim was denied initially on April 6, 2015, and upon reconsideration on October 29, 2015.  (*Id.* at 492, 507.)  On January 11, 2016, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 521.)  She appeared and testified at a hearing on March 8, 2017.  (*Id.* at 449-81.)  On July 26, 2017, the ALJ issued a decision

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

finding Plaintiff not disabled and denying her claims for benefits.  (*Id.* at 424.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 29, 2017. (*Id.* at 585.)  The Appeals Council denied her request for review on April 24, 2018, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 6-12.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

### A.    Age, Education, and Work Experience

Plaintiff was born on September 28, 1969, and was 47 years old at the time of the initial hearing.  (doc. 15-1 at 452.)  She dropped out of high school in the twelfth grade and does not have a GED.  (*Id.*)  She could speak and understand English.  (*Id.* at 634.)  She had no past relevant work experience.  (*Id.* at 470-71.)

### B.    Medical Evidence

On August 23, 2014, Plaintiff presented to the emergency room (ER) at Baylor Medical Center (Baylor) with complaints of abdominal pain.  (doc. 15-1 at 989).  She reported pain in the suprapubic area with urination and stated that her bladder "never hurt this bad before."  (*Id.* at 991.) She also reported blood in her urine and pain when walking.  (*Id.*)   Plaintiff had moderate abdominal tenderness, but there were no apparent or palpable abnormalities.  (*Id.* at 989.)  She was assessed with hemorrhagic cystitis and lower abdominal pain.  (*Id.* at 1008.)

On August 25, 2014, Plaintiff presented to the ER at Methodist Mansfield Medical Center (Methodist) with complaints of lower abdominal pain.  (doc. 15-1 at 939.)  She appeared in mild distress, but her vitals were normal.  (*Id.* at 942-43.)  Her physical examination was unremarkable and she displayed normal range of motion.  (*Id.* at 943.)  Plaintiff's back and extremities had no tenderness, her abdomen was soft, and her bowel sounds were normal.  (*Id.* at 943-44.)  She was

noted to be comfortable and not in acute distress.  (*Id.* at 944.)  A CT showed a small hiatal hernia with distal esophagitis.  (*Id.* at 945-46.)  Small bilateral kidney stones were observed, but there was no swelling of the kidneys.  (*Id.*)  Mild constipation was noted, but there was no obstruction to the gastrointestinal (GI) tract.  (*Id.*)  She was discharged the same day and instructed to follow-up with a urologist.  (*Id.* at 946.)

On the morning of September 22, 2014, Plaintiff arrived by ambulance to the ER at Baylor complaining of low back pain.  (doc. 15-1 at 973.)  She reported being punched down and choked, and it was noted that she was a victim of domestic violence.  (*Id.* at 974-75.)  Physical examination of her neck was negative for obvious evidence of injury or deformity.  (*Id.* at 985.)  She had full range of motion of the neck and reported no neck pain.  (*Id.*)  Plaintiff reported that she previously had back surgery, but her musculoskeletal examination was normal. (*Id.* at 975, 985.)  She was also noted as being neurovascularly intact with full normal range of motion.  (*Id.* at 985.)  Plaintiff's differential diagnoses was reported as contusions, alcohol intoxication, and narcotic abuse.  (*Id.* at 986.)  She was assessed with domestic violence, bladder infection, and chronic back pain and discharged that same day.  (*Id.* at 987, 973.)

On the evening of September 22, 2014, Plaintiff was admitted at Parkland Hospital (Parkland) with a self-inflicted stab wound to the neck.  (doc. 15-2 at 148.)  She reported being upset about a recent cancer prognosis and "wanted to end her life because she was tired of being sick." (*Id.*)  She was treated for a five centimeter laceration to the left side of the neck and transferred to inpatient psychiatry.  (*Id.* at 148, 151.)  Plaintiff initially refused to speak with the treating psychiatrist, Rebecca Hana, M.D., but eventually accepted treatment.  (*Id.* at 151.)  She reported being upset with her ex-husband and felt unsupported by her family.  (*Id.*)  She also had recently

learned of a bladder mass that could be malignant. (*Id.*) She reported a history of childhood sexual trauma and two prior suicide attempts. (*Id.*) Dr. Hanna noted Plaintiff's affect as anxious and insight/judgment as poor. (*Id.* at 151.) She was unable to assess her mood, thought process, and thought content, however. (*Id.*) Dr. Hanna's assessment was depression not otherwise specified (NOS) with a Global Assessment of Functioning (GAF) score of 21-30.[3] (*Id.* at 152.) Plaintiff was noted as being in imminent danger to herself and remained hospitalized for further treatment. (*Id.*)

Plaintiff had a psychiatry consult follow-up on September 24, 2014, and reported being in a "good" mood. (*Id.* at 278.) She denied current suicidal ideation and expressed regret about her recent suicide attempt. (*Id.* at 277.) Her GAF score had improved to 40. (*Id.*) Plaintiff was discharged on October 6, 2014[4]; she reported her mood as "good" and was noted as being "future oriented" on that date. (*Id.* at 333.) She was also noted as appearing logical and having significant improvement in mood. (*Id.*) Her discharge diagnoses was depression NOS and anxiety NOS, with a GAF of 50. (*Id.* at 333-34).

On November 5, 2014, Plaintiff presented to the ER at Parkland complaining of left hip pain. (doc. 15-2 at 352.) She reported worsening hip pain for the past six months, which she rated a 7 out of 10. (*Id.*) She was observed as having restricted range of motion of her left hip, but was not exhibiting edema. (*Id.* at 353.) Her straight leg raising was negative. (*Id.*)

On December 15, 2014, Plaintiff visited the ER at Baylor complaining of abdominal pain and vomiting. (doc. 15-2 at 391.) She was noted as being distressed and anxious, but denied suicidal

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).

[4] Plaintiff was admitted in the main hospital for seven days and was discharged to the inpatient psychiatric unit on September 30, 2014. (doc. 15-2 at 311.) She remained hospitalized in the psychiatric unit for seven more days. (*Id.* at 333.)

ideation.  (*Id.* at 395.)  An abdominal X-ray revealed no acute radiographic abnormality of the abdomen or chest.  (*Id.* at 405.)  Her bowel gas patterns were noted as normal and no free intraperitoneal air was present.  (*Id.* at 413.)  She had a few kidney stones that were unchanged from a prior examination.  (*Id.*)  It was also noted that Plaintiff had previous lumbar spine surgery with laminectomies bilaterally at L5, but appeared stable. (*Id.*)  Her diagnosis was a urinary tract infection (UTI). (*Id.* at 412.)

On January 6, 2015, Plaintiff presented to the ER at Parkland with complaints of nausea and coughing. (doc. 15-2 at 429.)  She also reported headaches, but denied experiencing dizziness or loss of consciousness.  (*Id.* at 431.)  Epigastric tenderness was noted but with no rebound; no other abnormalities were observed.  (*Id.* at 429.)  She returned back to Parkland two days later complaining of a rash on her face, nausea, and flank pain.  (*Id.* at 439.)  Physicial examination of her abdomen revealed tenderness in the lower left quadrant and left flank.  (*Id.*)  An abdominal CT revealed bilateral punctate kidney stones without evidence of acute urinary tract obstruction, and post cholecystectomy with two small choledochal cysts.  (*Id.* at 440-41.)

On February 25, 2015, Plaintiff presented to the ER at Baylor with complaints of lupus, Crohn's disease, fibromyalgia, and recurrent UTIs.  (doc. 15-2 at 360.)  She was noted as appearing uncomfortable but not in acute distress.  (*Id.* at 361.)  Her abdomen showed no edema, cyanosis, or clubbing.  (*Id.*)  A comprehensive metabolic panel was unremarkable and hemodynamically stable. (*Id.*)  Her chest X-ray revealed acute pneumonia, but was otherwise unremarkable.  (*Id.*)  A head CT showed evidence of chronic maxillary sinus disease.  (*Id.*)  She was assessed with pneumonia and designated for inpatient status due to her symptoms and underlying comorbidities.  (*Id.*)

On March 23, 2015, Plaintiff returned to the ER at Baylor with abdominal pain.  (doc. 15-3

at 32-33.)  A CT of her abdominal and pelvis showed multiple non-obstructing kidney stones that were noted to be stable.  (*Id.* at 33.)

On March 31, 2015, Scott Spoor, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment for Plaintiff.  (doc. 15-1 at 487-90.)  He noted her medically determinable physical impairments as severe spine disorders and severe essential hypertension.  (*Id.* at 487.)  Dr. Spoor opined that Plaintiff could lift and/or carry up to 50 pounds occasionally and 25 pounds frequently; was capable of unlimited push and/or pull, other than shown for lift and/or carry; could stand and/or walk for a total of 6 hours in an 8-hour workday; and could sit for a total of 6 hours in an 8-hour workday.  (*Id.* at 489.)  He noted that her statements about impairment related functional limitations and restrictions could not reasonably be accepted as consistent with the objective medical evidence and other evidence in the record. (*Id.* at 489-90.)

On April 1, 2015, SAMC Henry Hanna, Ph.D., reviewed Plaintiff's medical record as part of his assessment of her medically determinable mental impairments.  (doc. 15-1 at 486.)  Dr. Hanna opined that Plaintiff had non-severe affective disorder, but found insufficient evidence to complete a medical assessment of her mental impairments.  (*Id.* at 487-88.)

On April 2, 2015, Plaintiff presented to the ER at the Medical Center of Arlington (Arlington) complaining of abdominal pain, which she described as sharp and colic in nature and rated  a 10 out of 10, and nausea, and vomiting.  (doc. 15-4 at 235.)   An abdominal and pelvic CT showed colitis and nephrolithiasis.  (*Id.* at 236, 244-45.)  Evidence of lumbar spine surgery was seen, but there was no evidence of bowel obstruction.  (*Id.* at 231.)  A colonoscopy was performed the following day, which revealed severe colitis in the descending colon, tortuous sigmoid colon, and erythema, as well as possible mild colitis in the rectum.  (*Id.* at 240-41.) She remained in the hospital

for eight days and was discharged on April 9, 2015.  (*Id.* at 225.)

On May 11, 2015, Plaintiff returned to the ER at Arlington complaining of chest, back, and left flank pain. (doc. 15-4 at 205.)  An abdominal and pelvic CT showed no evidence of kidney swelling and no obstructing kidney stones. (*Id.* at 210, 214-15.)  A chest X-ray revealed no acute radiographic abnormality of the chest.  (*Id.* at 210, 216.)

On May 18, 2015, Plaintiff presented to the ER at Parkland complaining of persistent low back pain and left hip pain, which she described as constant and rated an 8 to 9 out of 10.  (doc. 15-2 at 467.)  She was noted to not be a candidate for surgery.  (*Id.*)  Plaintiff reported bruising easily, but her physical examination was unremarkable.  (*Id.* at 467-68.)  She was also noted to maintain a normal range of motion.  (*Id.* at 468.)  Her treating physician recommended medication and a referral for psychiatry.  (*Id.* at 468-69.)

On May 21, 2015, Plaintiff presented to the ER at Arlington after passing out and waking up on the floor.  (doc. 15-4 at 187.)  She reported headaches, weakness, and lightheadedness. (*Id.*) A brain CT revealed right frontal scalp swelling but was otherwise unremarkable.  (*Id.* at 194.)  A lumbosacral spine X-ray showed prior bilateral laminectomy at the L4-5 and L5-S1, but no evidence of fracture or subluxation.  (*Id.* at 196.)  Her lumbar discs at all levels were noted as appearing normal.  (*Id.*)

On May 29, 2015, Plaintiff visited the ER at Parkland complaining of abdominal pain, which she described as "stabbing" in nature, constant, and radiating to her back.   (doc. 15-2 at 515, 518.)  She also reported experiencing diffuse extremity tremors.  (*Id.* at 515.)  An abdominal CT showed kidney stones, but no evidence of obstruction.  (*Id.* at 518-19.)  She was noted as having gait instability and lower extremity weakness with twitching.  (*Id.* at 523-24.)  A brain CT revealed small

right mastoid effusion, but no acute intracranial normality. (*Id.* at 557.)  She remained in the hospital for two days and was discharged on May 31, 2015.  (*Id.* at 497.)

On July 5, 2015, Plaintiff presented to the ER at Arlington complaining of left flank pain radiating into her abdomen.  (doc. 15-4 at 173.)  She denied chills, cough, shortness of breath, and headaches.  (*Id.*)  Her abdomen was noted as being soft and non-tender, and no peritoneal signs were found.  (*Id.* at 176.)  She had full range of motion in her back, but left costovertebral angle (CVA) tenderness was noted.  (*Id.*)  She had normal mood and affect and appeared alert and oriented with no motor deficits.  (*Id.*)  A renal ultrasound showed a small left kidney stone, but there was no evidence of kidney swelling.  (*Id.* at 178.)  An abdominal X-ray performed the following day also showed kidney stones, but no other significant findings were noted.  (doc. 15-2 at 741.)

On August 13, 2015, Plaintiff returned to the ER at Arlington complaining of severe right flank pain.  (doc. 15-4 at 166.)  She was diagnosed with a lower UTI.  (*Id.*)  A CT of the abdomen and pelvis showed multiple kidney stones, but no evidence of kidney swelling or obstructive changes of the renal collecting systems.  (doc. 15-3 at 715.)  No interval changes since her prior examination were noted.   (*Id.*)  The treating physician assessed Plaintiff with acute pyelonephritis, abdominal pain and distention, and severe pain exacerbated by anxiety.  (*Id.* at 755-56.)

On August 17, 2015, Plaintiff was admitted at Baylor with complaints of flank pain and fever.  (doc. 15-3 at 1562.)  Her condition was noted as "fair," and she was crying, moaning, and screaming with pain.  (*Id.* at 1562-64.)  She was diagnosed with a kidney infection/UTI, remained in the hospital for five days, and was discharged on August 21, 2015. (*Id.* at 1365.)

On September 25, 2015, Plaintiff presented to Gerald Stephenson, Ph.D., for a mental status examination.  (doc. 15-2 at 605.)  Dr. Stephenson noted that she had been hospitalized with a self-

inflicted laceration to her neck in September 2014. (*Id.*) She was cooperative and appeared to be forthcoming. (*Id.*) She reported being disabled based on her history of depression and multiple suicide attempts, and having multiple health issues with chronic pain, neuropathy, and fibromyalgia. (*Id.* at 606.) Plaintiff said she left work in 2011 because her physical condition made it hard for her to work. (*Id.*) She reported being able to perform household chores, but would have to sit down and rest from time to time, and she was able to drive and visit with her friends and family. (*Id.*)

Dr. Stephenson reported that Plaintiff's thinking was coherent, logical, and free of loose associations. (*Id.* at 607.) She denied being suicidal and stated that she had cut herself last year "to try to make the rage go away." (*Id.* at 608.) Plaintiff presented with mildly anxious mood with full affect but became more relaxed as the interview progressed. (*Id.*) Dr. Stephenson estimated her general mental ability in the "average range" and noted that she demonstrated self-awareness. (*Id.* at 609.) He diagnosed her with pain disorder with physiological pain affecting cognitive efficiency, unspecified depressive disorder associated with chronic pain, and episodic rage that appeared to be her overreacting to precipitating events. (*Id.*) He also provided a provisional diagnosis of obsessive-compulsive traits associated with anxiety. (*Id.*) Dr. Stephenson opined that her psychological prognosis was fair, but clouded by multiple physical disorders and chronic pain. (*Id.*)

Dr. Stephenson provided the following assessment of Plaintiff's functional capacity:

> She understands complex instructions and is able to remember and follow them. It is probable on the basis of her report that she is unable to complete work-related tasks in a timely manner due to chronic pain and a need for periodic periods of rest. She reported being able to perform many household chores but not to be able to tolerate the strain of pulling a vacuum cleaner of only six pounds. She has the ability to relate and to interact appropriately with others, including coworkers, managers and the public. Due to what appears to be a complex of painful and debilitating conditions, she does not appear to be able to cope consistently with the demands of a place of business.

9

(*Id.* at 609.)  Dr. Stephenson concluded that Plaintiff was capable of receiving funds and understood the purpose of the evaluation.  (*Id.*)

On October 8, 2015, Plaintiff presented to Parkland complaining of dizziness, lightheadedness, and feeling like she was going to pass out.  (doc. 15-2 at 761.)  She reported that she had visited the hospital "every 4-6 weeks . . . for various illnesses."  (*Id.*)  Plaintiff had normal range of motion with no tenderness and normal strength and was alert and oriented in all spheres. (*Id.* at 765.)  She also reported abdominal pain and was taken to urology for further evaluation.  (*Id.* at 767.)  An abdominal CT revealed a small 4 to 5 mm stone within the mid aspect of the right ureter, but no evidence of kidney swelling.  (*Id.* at 770.)  Additional non-obstructing hypodensities were also identified in both kidneys, which were noted as non-obstructing nephrolithiasis.  (*Id.*)  She was transferred to the operating room for right ureteral stent placement and was discharged the following day.  (*Id.* at 771.)

On October 10, 2015, Plaintiff was admitted to urology at Parkland for evaluation of infected kidney stones and pain control.  (doc. 15-2 at 798.)  Physical examination revealed tenderness in the suprapubic area, as well as CVA tenderness.  (*Id.* at 798-99.)  She reported pain with urination, but her treating physician noted that her symptoms were "very typical" of patients after stent placement. (*Id.* at 799.)  Her renal ultrasound and abdominal X-ray were both unremarkable and demonstrated adequate positioning of the stent.  (*Id.* at 802-03, 818-19.)  A urine culture grew proteus and she was treated with antibiotics.  (*Id.* at 826.)  She was diagnosed with kidney stones and was approved for a future stent placement.  (*Id.*)  Plaintiff stayed in the hospital for three days and was discharged on October 12, 2015.  (*Id.*)

On October 20, 2015, SAMC Betty Santiago, M.D., prepared a physical RFC assessment of

10

Plaintiff that generally mirrored Dr. Spoor's physical RFC, except she determined that Plaintiff could only lift and/or carry up to 20 pounds occasionally and 10 pounds frequently. (doc. 15-1 at 501-02.)

On October 22, 2015, SAMC Matthew Wong, Ph.D., disagreed with Dr. Hanna's April 1, 2015 initial assessment of Plaintiff's mental impairments, finding that there was sufficient medical evidence of severe somatoform disorder. (doc. 15-1 at 499.) He completed a psychiatric review technique (PRT) assessment and opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; mild difficulties in maintaining social functioning; and moderate restriction of activities of daily living. (*Id.*) He also opined that she would have one or two repeated episodes of decompensation, each of extended duration, and that her allegations were partially supported by the evidence of record. (*Id.*)

Dr. Wong also completed a mental residual functional capacity assessment (RFC) for Plaintiff. (*Id.* at 503-04.) He opined that she was moderately limited in the ability to understand and remember detailed instructions. (*Id.* at 503.) She had sustained concentration and persistence limitations and was moderately limited in the abilities to carry out detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 503-04.) Plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting. (*Id.* at 504.) Dr. Wong concluded that Plaintiff had the mental RFC to understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and

respond appropriately to changes in routine work setting. (*Id.*)

On November 17, 2015, Plaintiff presented to Methodist with complaints of nausea and abdominal pain. (doc. 15-2 at 858.) A CT of her abdomen and pelvis showed right ureteral stent with no evidence of kidney swelling, and was unremarkable. (*Id.* at 865, 878-79.)

On November 24, 2015, Plaintiff arrived by ambulance at Parkland with a self-inflicted stab wound to the abdomen. (doc. 15-2 at 612.) She reported having problems with her ex-husband and stabbing herself with a ten-inch long straight bladed knife. (*Id.*) On arrival, she was seizing with rigid arms, shaking to chest, and eyes rolled back. (*Id.* at 617.) She "had never had so much pain in her life" and "it hurt[] too much to breathe." (*Id.*) An exploratory laparotomy of her abdomen revealed no significant findings, and her stab wound was treated. (*Id.* at 617, 636-37.) Plaintiff was evaluated by a psychiatrist, who determined that she required further hospitalization due to suicide risk. (*Id.* at 621.) The psychiatrist's initial diagnoses of Plaintiff was mood disorder NOS, and borderline personality disorder with a GAF of 41-50. (*Id.* at 627.) The following day, Plaintiff reported that her self-inflicted stab wound was not a suicide attempt, but an attempt at "trying to make the anger go away." (*Id.* at 635.) She remained in the hospital for six days and was discharged on November 29, 2015. (*Id.* at 649-55.)

On December 4, 2015, Plaintiff returned to the ER at Parkland complaining of abdominal pain from her previous stabbing and subsequent surgery. (doc. 15-2 at 910.) She was "extremely tender to palpation to all abdominal quadrants, worst around the wound." (*Id.* at 912.) An abdominal CT showed few prominent ileal loops in the pelvis, but no transition point or proximal small bowel dilatation to suggest small bowel obstruction. (*Id.* at 950, 959-60.) A few non-obstructing kidney stones were also observed. (*Id.*) Kidney findings were unchanged, (doc. 15-3 at 918), and

abdominal x-rays were unremarkable, (doc. 15-2 at 1019).  She remained in the hospital for five days and was discharged on December 8, 2015.  (*Id.* at 997.)

On January 18, 2016, Plaintiff was admitted to the ER at Methodist with abdominal pain and fever.  (doc. 15-2 at 1094.)  She was initially assessed with sepsis and a UTI, but her laboratory work-up was negative for endocarditis, and her white blood cell count was normal.  (*Id.* at 1098.)  The attending physician strongly suspected that Plaintiff had Munchausen syndrome.  (*Id.* at 1098, 1124.)  Plaintiff had some mild tenderness in her right flank, but her abdomen was soft.  (*Id.* at 1108.)  A chest and abdominal CT showed a small, non-obstructing kidney stone, but imaging was otherwise unremarkable.  (*Id.* at 1114, 1123.)

Plaintiff underwent a cystourethroscopy, and a ureteroscopy was unremarkable with no bladder neck contracture.  (*Id.* at 1125-27.)  A pan-cystoscopy was also unremarkable and demonstrated normally-located bilateral ureteral orifices, with clear efflux from the left and a stent exiting the right ureteral orifice.  (*Id.*)  No erythematous lesions or sessile or papillary tumors were noted.  (*Id.*) Plaintiff's postoperative diagnoses were fungemia, bacteremia, right kidney swelling, malpositioned right ureteral stent (replaced), and partially duplicated left renal collecting system.  (*Id.*)  She remained in the hospital for twenty-nine days and was discharged on February 16, 2016.  (*Id.* at 1094.)

On May 5, 2016, Plaintiff presented to the ER at Methodist with complaints of right abdominal pain with associated nausea and vomiting.  (doc. 15-2 at 1256).  She reported chronic flank pain over the past few years.  (*Id.*)  Physical examination revealed mild right sided tenderness to palpation, but no rebound tenderness.  (*Id.*)  Murphy's sign was negative and she had no peritoneal signs.  (*Id.* at 1258.)  The treating physician noted that Plaintiff's physical examination

13

was "inconsistent" with her alleged symptoms.  (*Id.*)

On June 6, 2016, Plaintiff presented to the ER at Arlington for her UTI. (doc. 15-4 at 123.) She returned on June 17, 2016, complaining of subjective fevers and chills and ongoing flank pain. (*Id.* at 89.)  She had been taking antibiotics to treat her UTI, but reported that her symptoms had not improved.  (*Id.*)  A urine culture came back positive for Citrobacter freundii and she was placed on different antibiotics.  (*Id.*)  She was also seen by the infectious disease specialist.  (*Id.*)  An abdominal CT revealed no evidence of obstructing kidney stones or leukocytosis.  (*Id.*)  A renal ultrasound showed no specific abnormality of the bladder.  (*Id.* at 110.)  She remained in the hospital for five days and was discharged on June 21, 2016.  (*Id.*)  Her discharge diagnoses were acute kidney infection, improving UTI, peripheral neuropathy, and chronic pain syndrome.  (*Id.*)

On July 5, 2016, Plaintiff returned to the ER at Arlington with abdominal pain.  (doc. 15-4 at 68.)  An abdominal CT was unremarkable and revealed no focal acute osseous abnormality or changes to her kidney stones.  (*Id.* at 81.)  She received antibiotics for her UTI and was discharged the same day.  (*Id.* at 75-76.)

On August 25, 2016, Plaintiff returned to the ER at Arlington for right groin and leg pain. (doc. 15-4 at 40.)  An abdominal and pelvic CT showed the right ureteral stent remained in place and its position was stable.  (*Id.* at 47, 56.)  There was also no evidence of kidney swelling.  (*Id.*) An ultrasound revealed no evidence of deep venous thrombosis in the right lower extremity.  (*Id.* at 55.)

On September 15, 2016, Plaintiff presented to the ER at Parkland after she passed out and fell to the ground.  (doc. 15-3 at 4.)  Her laboratory work-up was negative and there was no evidence of kidney failure.  (*Id.* at 14.)  The examining doctor reported that her symptoms were likely caused

14

by taking too many sedating medications, including Ambien, Xanax, baclofen, gabapentin, methocarbamol, and hydrocodone. (*Id.*) She was advised to discard her old medication and to never take them at the same time. (*Id.*) She was treated for passing out spells (syncope) and was discharged the following day. (*Id.*)

On September 19, 2016, Plaintiff presented to the ER at Baylor for acute worsening right-sided abdominal pain. (doc. 15-3 at 529.) Her abdomen appeared flat, rounded, and symmetrical. (*Id.* at 531.) Her bowel sounds were audible and active in all quadrants. (*Id.* at 374.) She had some right-sided flank pain, but no abnormal GI or genitourinary findings were identified. (*Id.*) She was able to void painlessly and without difficulty. (*Id.*) A renal ultrasound showed the right ureteral stent but was otherwise "unremarkable." (*Id.* at 1617.) Plaintiff underwent surgery for removal of the ureteral stent, and a cystoscopy was also performed with normal findings. (*Id.* at 505.) Each calyx was examined, and no stones were seen. (*Id.*) The kidney stones were noted to be resolved and she was discharged shortly after the operation on September 23, 2016. (*Id.* at 880.)

On October 18, 2016, Plaintiff presented to the ER at Arlington after slipping and landing on her tailbone. (doc. 15-4 at 2.) Her coccyx was tender, but examination of the thoracic and lumbar spine and paraspinals was negative. (*Id.* at 5.) She appeared alert and oriented and had full range of motion of the neck. (*Id.*) A pelvic X-ray was negative with no significant interval changes observed. (*Id.* at 6, 10.) Lumbosacral X-rays showed no fracture or subluxation of the lumbar spine, but there was narrowing of the disc space heights at L4-5 and L5-S l. (*Id.* at 6, 9.) Postoperative changes at L4, LS, and S1 were also noted. (*Id.*)

On November 11, 2016, Plaintiff presented to the ER at Baylor with a fever as well as

abdominal pain, nausea, vomiting, and flank pain. (doc. 15-4 at 805.)  She was initially treated for a UTI and started on intravenous antibiotics, but her conditioned worsened and she developed septic shock.  (*Id.*)  She required vasopressor therapy and endotracheal intubation for ventilatory support and was noted as having acute colitis.  (*Id.*)  Her Clostridium difficile toxin results were positive and she was assessed for a possible toxic megacolon.  (*Id.*)  There was evidence of acute renal failure, shock liver, and elevated troponin, which were consistent with hypoperfusion.  (*Id.* at 805-06.)  Plaintiff underwent a colonoscopy, which revealed some ulcerations and erythema in the left colon.  (*Id.* at 806.)  Biopsies showed fibrin thrombi consistent with lupus cryoglobulinemia rather than hypoperfusion.  (*Id.*)  Plaintiff gradually stabilized and was discharged on November 24, 2016, after being in the hospital for thirteen days.  (*Id.* at 805-06.)

On December 19, 2016, Plaintiff presented to Baylor for abdominal pain.  (doc. at 15-4 at 616-17.)  Her condition was "fair," and she was diagnosed with a UTI, left upper quadrant abdominal pain, and dehydration from vomiting.  (*Id.* at 617.)  Her mother reported that Plaintiff had been "overusing" her pain medication and took thirty Norcos in the last three days.  (*Id.* at 620.)  An abdominal CT revealed at least five non-obstructing kidney stones in the lower left kidney, and an unspecified number of smaller kidney stones in the upper left kidney.  (*Id.* at 629.)  No kidney stones were observed in the right kidney, but calcified phleboliths were seen in the pelvis.  (*Id.*)  She remained in the hospital for four days and was discharged on December 22, 2016.  (*Id.* at 616.)

On January 6, 2017, Plaintiff returned to the ER at Baylor for right flank pain.  (doc. 15-4 at 596.)  She reported right flank pain while shopping and thought she was passing a kidney stone.  (*Id.* at 597.)  She had been hospitalized frequently but had not been following up with her primary care provider and preferred going to Baylor for her medical care.  (*Id.*)  Plaintiff was initially

assessed with essential hypertension, anemia, acute UTI, and history of systemic lupus erythematosus.  (*Id.* at 598.)  CT scans of the abdomen and pelvis showed no acute abnormality other than the presence of several small, but stable non-obstructing left kidney stones.  (*Id.* at 600.)  The liver, spleen, adrenal glands, pancreas, stomach, and bowels were unremarkable. (*Id.*)  A chest X-ray showed no acute abnormality, and her peripherally inserted central catheter was "adequately positioned."  (*Id.* at 602.)  A Ceretec whole body scan showed normal white blood cells.  (*Id.* at 603.)  Plaintiff took antibiotics to treat her UTI and possible bacteremia, and was discharged on January 22, 2017, afting being in the hospital for sixteen days.  (*Id.* at 598.)

On February 6, 2016, Plaintiff presented to the ER at Baylor for flank pain.  (doc. 15-4 at 851.)  She experienced similar symptoms to her previous kidney infections and had been on multiple antibiotics, but they were not helping.  (*Id.* at 862.)  She reported seeing a urologist who opined that her symptoms might be from lupus flare, but that she was unable to take medication for lupus due to her allergies.  (*Id.*)  An abdominal and pelvic CT revealed small bilateral non-obstructing left kidney stone, but no evidence of acute appendicitis.  (*Id.* at 873-74.)

Plaintiff returned to the ER at Baylor with flank pain on February 21, 2017.  (doc. 15-4 at 876.)  The treating physician noted "multiple frequent admissions with similar complaints," during which her symptoms were determined to be infections, and she was discharged with antibiotics.  (*Id.* at 903.)  Plaintiff stated that she would complete her antibiotics, but her problems would start up again.  (*Id.*)  Even though her initial work-up was stable, she was admitted for further evaluation.  (*Id.*)  She had moderate abdominal tenderness in the left upper quadrants and mild CVA tenderness on the left side of her genitourinary system.  (*Id.* at 889.)  She had full range of motion in her back and was negative for CVA tenderness.  (*Id.*)  A renal ultrasound revealed possible evidence of

17

kidney stones and kidney swelling, but a normal ureteral jet was observed in the urinary bladder. (*Id.* at 904.)  The treating physician described Plaintiff's pain as "atypical" and she was monitored on pain control.  (*Id.* at 904-05.)  She was treated and discharged the same day.  (*Id.* at 903-05.)

**C.    <u>Hearing</u>**

On March 8, 2017, Plaintiff and a VE testified at a hearing before the ALJ.  (doc. 15-1 at 449-76.)  Plaintiff was represented by an attorney at the hearing.  (*Id.* at 451.)

### 1.    Plaintiff's Testimony

Plaintiff testified that she was divorced and was living with her mother.  (doc. 15-1 at 457.) She had adult children.  (*Id.*)  She stayed in high school all the way through the twelfth grade, but did not have a GED.  (*Id.* at 457-58.)  She weighed between 92 and 110 pounds; her weight would fluctuate when she got sick.  (*Id.* at 458.)  She had worked as a veterinary technician at a veterinary hospital for fifteen years, but there were not a lot of earnings showing up in the official Social Security earnings record for that job because she was treated like an "outside contractor" and was paid "under the table" by her boss.  (*Id.* at 459.)  This was because she had to be hospitalized all the time and could not be kept on a regular weekly schedule.  (*Id.*)  As a veterinary technician, she would assist in and prepare for surgeries, give vaccinations, bathe animals, take animals to the restroom, clean out cage kennels, and do laundry.  (*Id.*)  She had last worked at the veterinary hospital five years ago.  (*Id.*)  She was no longer able to work there because she had "OCD really bad," and it was difficult to work in the hospital setting because she was so clean, and she would struggle to even sit down.  (*Id.* at 460.)

When she pushed herself at work, Plaintiff experienced back and kidney pain, and her neuropathy would worsen.  (*Id.*)  Her kidney pain was the "worst" of her pain symptoms and felt like

18

stabbing at times, throbbing, burning, and sometimes shooting when passing kidney stones. (*Id.* at 461.)  Riding in a car, lifting anything, and doing any bending aggravated the pain.  (*Id.*)

Plaintiff took pain medication but it would not make the pain disappear.  (*Id.* at 462.)  She visited the hospital frequently and had been admitted four separate times in the past three months.  (*Id.*)  During each trip to the ER, she was never told by the medical professionals that she should not go to the ER for medical treatment.  (*Id.*)  She was instructed to rest, alter her diet, and drink lots of water to keep her symptoms from flaring up or worsening.  (*Id.* at 463.)  She lay down for three hours within an eight-hour period on a "good day," and all day on an "average day." (*Id.* at 463-64.)  She also experienced back pain, which resulted from complications during an emergency back surgery six years ago.  (*Id.* at 464.)

Plaintiff had experienced problems with depression and still had symptoms.  (*Id.* at 466.)  She got depressed because she was sick all the time and had to go to the hospital.  (*Id.*)  She did not have any energy, struggled with controlling her emotions, got really angry, and experienced rage because of her pain.  (*Id.*)  Her depression and medication made it very hard for her to concentrate and remember things.  (*Id.*)  She also had severe insomnia and could sleep no more than four hours at a time, even on a "good night." (*Id.* at 467.)  She went to a treating physician on occasion, but did not think that her doctor really addressed her medical issues.  (*Id.*)

Plaintiff was able to help her mother carry groceries, but could not lift more than five to ten pounds at a time.  (*Id.* at 468.)  She estimated that she could stand for ten minutes, walk for twenty minutes, and sit for thirty minutes at a time, before experiencing pain.  (*Id.*)  Because of her neuropathy, she had no strength in her hands and was unable to do tasks like peeling a potato, shuffle cards, or use a manual can opener.  (*Id.* at 468-69.)  She could only go to the grocery store

with her mother on a "good day" because she was unable to walk the whole store.  (*Id.* at 471.)  She was unable to vacuum or use a stove top and had quit driving over five years ago.  (*Id.*)

Plaintiff lacerated her neck in 2014 and stabbed herself in 2015 because she was experiencing "a lot of rage" from being abused as a child.  (*Id.* at 473-74.)  When she could not make the rage go away, she would "act out" by hurting herself.  (*Id.* at 474.)  She had passed fourteen kidney stones in the past two years and currently had five kidney stones.  (*Id.* at 477.)  She had a couple of stents put in because the stones would not pass, but the stones continued to form. (*Id.* at 478.)

### 2.    VE's Testimony

The VE testified that a hypothetical individual with the same age, education, and work experience history as Plaintiff who missed work five times a month would be unable to sustain employment; one to two absences per month would be tolerated.  (doc. 15-1 at 476.)[5]  A hypothetical individual who missed twenty-four days of work consistently for three years would not be able to sustain employment.  (*Id.*)

The same hypothetical person, but who could perform simple, one to two-step tasks; concentrate for two hours at a time; lift up to ten pounds; sit six out of eight hours and walk six out of eight hours, could perform sedentary unskilled work.  (*Id.*)  If the hypothetical person was off task on average of one hour a day at unanticipated times due to body and kidney pain, she would be unable to maintain employment.  (*Id.* at 477.)

A second hypothetical individual with the same age, education, and work experience as

---

[5]The ALJ instructed the VE that for purposes of the case, Plaintiff had no past relevant work.  (doc. 15-1 at 475-76.)

Plaintiff with a pain disorder that affected cognitive efficiency, who could understand, remember and follow complex instructions, and had the ability to relate and to interact appropriately with others, including co-workers, mangers, and the public, but was unable to cope consistently with the demands of a place of business because of complex painful and debilitating physical conditions, would not be able to maintain work, even at the sedentary level. (*Id.* at 478-79.) An individual who was unable to complete work-related tasks in a timely manner due to problems of chronic pain and the need for periodic rest breaks would not be able to be competitively employed. (*Id.* at 479.)

## D.    **ALJ's Findings**

The ALJ issued his decision denying benefits on July 26, 2017. (doc. 15-1 at 427-48.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since October 17, 2014, the application date. (*Id.* at 429.) At step two, the ALJ found that she had the following severe impairments: spine disorders, dysfunction major joints, somatoform disorder, and affective disorder. (*Id.*) Despite those impairments, at step three, he found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work, except she could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (*Id.* at 431.) At step four, the ALJ determined that Plaintiff had no past relevant work. (*Id.* at 440.) At step five, the ALJ relied on the VE's testimony to find her capable of performing all of the unskilled sedentary occupations with each occupation representing numerous jobs in the national economy. (*Id.* at 440-41.) Accordingly, the

ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since October 17, 2014, the date the application was filed. (*Id.* at 441.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).[6]  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

---

[6]The scope of judicial review of a decision under either the supplemental security income program or the social security disability program is the same. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  The relevant law and regulations governing the determination of claims under either program are also identical, so courts may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  RESIDUAL FUNCTIONAL CAPACITY

Plaintiff presents one issue for review:

A finding a claimant can engage in substantial gainful activity requires more than a simple determination the claimant can find employment and that she can physically perform certain jobs; it also requires a determination the claimant can hold whatever job she finds for a significant period of time. The Vocational Expert testified that continued employment was precluded if a claimant missed over 24 days in a year. Record evidence demonstrated [Plaintiff] visited hospital emergency rooms or was admitted for more than 208 days since the alleged onset date. Was the Administrative Law Judge's residual functional capacity supported by substantial evidence if he did not consider [Plaintiff's] ability to sustain work?

(doc. 20 at 3-4.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 416.945(a)(1).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 416.945(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's [RFC]."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has

no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

A.    **Ability to Sustain Employment**

Plaintiff claims that the ALJ was required to make a specific finding that she could maintain employment because she presented evidence of multiple emergency and hospital admissions and other procedures and doctor appointments that "would have affected her ability to work an entire day." (doc. 20 at 14-16.)

A finding that a social security claimant is able to engage in substantial gainful activity requires "more than a mere determination that the claimant can find employment and that he can

physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *see also Leidler v. Sullivan*, 885 F.2d 291, 292-93 (5th Cir. 1981).  This requirement extends to cases involving mental as well as physical impairments.  *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002).  The ALJ is not required in every case to make specific and distinct findings that the claimant can maintain employment over a sustained period, however.  *Frank v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).  An RFC determination itself encompasses the necessary finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms."  *See id.*; *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).  A specific finding is required if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC."  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).  Allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on the ability to maintain employment.  *See Perez*, 415 F.3d at 465.

The evidence before the ALJ showed that between September 2014 and February 2017, Plaintiff visited the ER on at least twelve separate occasions with kidney-related problems (docs. 15-2 at 515, 761, 798, 910, 1094; 15-3 at 529, 1562; 15-4 at 89, 235, 596, 616, 805), as well as two other occasions for mental health treatment (doc. 15-2 at 148, 612).  During this period, she was hospitalized for over one hundred days.  (*Id.*)  Plaintiff had other medical treatments and doctor appointments within this time frame as well.  (docs. 15-2 at 352, 360, 391, 429, 467, 858, 1256; 15-3 at 32; 15-4 at 2, 4, 40, 68, 123, 166, 173, 187, 205, 851, 876.)  At the hearing, Plaintiff testified that

while the veterinary hospital tried to accommodate her medical issues, she was unable to maintain a regular work schedule due to her frequent hospitalizations and had to quit working.  (doc. 15-1 at 460.)  She also testified that she had passed fourteen kidney stones with difficulty, had five more, and anticipated that they would cause her similar issues.  (*Id.* at 477-78.)  The VE testified that absenteeism of one to two days per month would be tolerated for a hypothetical individual with the same age, education, and work history as Plaintiff, but the individual would not be able to sustain employment if she missed twenty-four days of work consistently for three years. (*Id.* at 476.)

The ALJ recounted Plaintiff's extensive hospital visits throughout the alleged disability period.  (doc. 15-1 at 433-38.)  While acknowledging that her numerous ER visits, the ALJ noted that "it is not the number of times a person has been to the emergency room or hospital, but rather what is found on those visits that is dispositive," and that "despite the numerous emergency department visits," Plaintiff's physical examinations were "generally normal with minimal, if any, objective findings."  (*Id.* at 438.)  He also noted that "[t]he treatment records show the claimant failed to follow treatment recommendations," which "demonstrates a possible unwillingness to do that which is necessary to improve her condition."[7]  (*Id.*)

According to the Social Security Regulations, "[t]he RFC assessment must be based on all of the evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication). . . ." SSR 96-8P, 1996 WL 374184 at *5.  In other words, "if

---

[7]  In Plaintiff's reply brief, she argues for the first time that the ALJ circumvented SSR 82-59 by considering treatment compliance when determining her RFC. (doc. 22 at 5.)  Arguments not presented in an initial brief are waived. *See Jacobs v. Tapscott*, No. CIV.A.3:04-CV-1968-D, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006), *aff'd by* 277 F. App'x 483 (5th Cir. 2008) ("[T]he court will not consider an argument raised for the first time in a reply brief.") Notwithstanding waiver, SSR 82-59 applies only if the ALJ has made an initial finding of disability.  *See* SSR 82-59, 1982 WL 31384, at *1 (S.S.A. January 1, 1982).

an individual's medical treatment interrupts her ability to perform a normal, eight hour workday, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." *Thornton v. Colvin*, No. CV 15-0407, 2016 WL 1136627, at *13 (E.D. La. Feb. 29, 2016) (citing *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000)), *adopted by* 2016 WL 1110231 (E.D. La. Mar. 22, 2016). The clinical notes from several of Plaintiff's visits to the ER showed normal results. (docs. 15-2 at 148, 515, 612, 761, 798, 910, 1094; 15-3 at 529, 1562; 15-4 at 89, 235, 596, 616, 805.) During one visit, Plaintiff acknowledged that she preferred going to Baylor for her medical treatment. (doc. 15-4 at 597.) She also had not been taking her pain medication and had not been following up with her primary care physician. (*Id.*) At another ER visit, it was noted that Plaintiff might have Munchausen syndrome and could be seeking medical treatment as a means of getting attention. (doc. 15-2 at 1124.) While no abnormalities were noted in several of her examinations, the treating physicians ultimately determined that her symptoms warranted extensive testing and further evaluation. (docs. 15-2 at 148, 515, 612, 761, 798, 910, 1094; 15-3 at 529, 1562; 15-4 at 89, 235, 596, 616, 805.) Her hospital records show hospitalization for several days at a time. (*Id.*) For instance, she was hospitalized with recurring kidney-related problems for 24 days in 2015, 45 days in 2016, and 16 days in January of 2017. (docs. 15-2 at 515, 761, 798, 910, 1094; 15-3 at 529, 1562; 15-4 at 89, 235, 596, 616, 805.) She was also separately hospitalized for mental issues for 14 days in 2014 and for 6 days in 2015. (doc. 15-2 at 148, 612.) This exceeds the tolerance of one to two absences per month indicated by the VE. (doc. 15-1 at 476.)

When reviewing the medical records from Plaintiff's frequent trips to the ER, the ALJ acted properly in assessing the purpose and outcome from those visits. *See Griffin v. Comm'r of Soc. Sec.*, No. 2:15-CV-13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017) ("Absenteeism due to the

28

frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded."). While the ALJ's findings are entitled to deference, the decision to either ignore or discredit Plaintiff's hospital stays lasting more than one day results in an RFC that is not supported by substantial evidence, however. *See Boyd,* 239 F.3d at 704 (explaining that an ALJ's findings are not supported by substantial evidence "if no credible evidentiary choices or medical findings supported the decision") (internal citations and quotation marks omitted). Most of her ER visits resulted in her staying in the hospital between two and twenty-nine days, which undermines a finding, whether implicit or explicit, that Plaintiff's initial ER visits were not appropriate. (*See* docs. 15-2 at 148, 515, 612, 761, 798, 910, 1094; 15-3 at 529, 1562; 15-4 at 89, 235, 596, 616, 805.) The frequency and duration of Plaintiff's hospital stays constitute clear evidence that absenteeism might be impacted by her medical impairments.[8]

Even though the record contains evidence of extensive hospital treatment that appears to be medically necessary, there is no indication of the ALJ's position concerning absenteeism and its impact on Plaintiff's ability to perform substantial gainful activity. The evidence establishes that Plaintiff had recurring symptoms of sufficient frequency to prevent her from holding a job for a significant period of time. *Solis v. Astrue*, No. 5:07-CV-084-C, 2008 WL 755223, at *3 (N.D. Tex. Mar. 21, 2008) (citing *Frank*, 326 F.3d at 619-20). Given the duration and frequency, and evidence that she continued struggling with kidney stones and other kidney-related issues, the ALJ should have addressed Plaintiff's extensive hospitalizations in connection with the issue of absenteeism.

---

[8]  Plaintiff also submitted evidence to the Appeals Council showing that between April 2017 and November 2017, she was admitted to the hospital with kidney pain for thirty-two days. (*See* doc. 15-1 at 94-109 (hospitalized for 9 days from September 7, 2017 to September 25, 2017); 133-34 (one day ER visit on November 25, 2017); 172-73 (one day ER visit on April 14, 2017); 212-13 (one day ER visit on May 11, 2017); 253-56 (hospitalized for 17 days from May 17, 2017 to June 2, 2017); 338-39 (one day ER visit on June 4, 2017); 380-82 (one day ER visit on July 8, 2017)).

*See, e.g., Johnson v. Colvin*, No. 14-CV-4213-G, 2016 WL 791291, at *5 (N.D. Tex. Feb. 8, 2016) (finding that claimant had presented sufficient evidence that her conditions waxed and waned where the record showed she spent 26 days in the hospital over a 21-month period, underwent numerous blood transfusions and insulin adjustments, and had monthly doctors' appointments to attend to her conditions), *adopted by* 2016 WL 775675 (N.D. Tex. Feb. 29, 2016); *Payne v. Comm'r, Soc. Sec. Admin.*, No. CIV. SAG-14-1015, 2015 WL 412923, at *1 (D. Md. Jan. 29, 2015) (finding the ALJ's analysis deficient for failing to discuss claimant's anticipated absenteeism as a result of his kidney stones or related issues that required frequent medical attention, including thirty-five hospitalizations, surgical procedures, and ER visits over a two year period). In light of this evidence, the ALJ erred by failing to make the specific determination required by *Singletary*. *See Leidler*, 895 F.2d at 293-94; *Frank*, 326 F.3d at 619.

**B.    Harmless Error**

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (per curiam) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988) (per curiam)). When the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial." *Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990) (quoting *Leidler*, 885 F.2d at 294). In other words, the Fifth Circuit has left the lower courts no discretion to determine whether legal error was harmless. *See Moore*, 895 F.2d at 1069-70. A failure to apply the *Singletary* standard is not a procedural error, but a legal error mandating remand. *See Cline v. Astrue*, 577 F. Supp. 2d 835, 850 (N.D. Tex. 2008) (explaining that the ALJ's failure to make the specific determination required by *Singletary* constitutes legal error).

Given the ALJ's legal error, this case should be remanded with directions to the ALJ to apply the correct legal standard as set forth in *Singletary*.[9]

## IV.  RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the Commissioner be **REVERSED**, and the case be **REMANDED** for reconsideration.

**SO RECOMMENDED**, on this 24th day of April, 2019.

*Irma Carrillo Ramirez*

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE\

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*Irma Carrillo Ramirez*

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9]  Plaintiff filed *Plaintiff's Sur Sur-Reply Brief* (doc. 26) without seeking leave of court as required by the local rules, so the arguments presented in that brief will not be considered.  Even if considered, if would not change the recommended outcome in this the case.